## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**ALEJANDRA LAVALLE CERVANTES**,

    Plaintiff,

    v.

**INTERNATIONAL HOSPITALITY ASSOCIATES, S. en C. (SE), d/b/a Hotel La Concha**, *et al.*,

    Defendants.

Civil No. 14-1356 (BJM)

## OPINION AND ORDER

Alejandra Lavalle Cervantes ("Lavalle") brought this action against International Hospitality, Inc. and International Hospitality Associates, S. en C. (SE), d/b/a Hotel La Concha (collectively, "the Hotel"), alleging discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and several state-law provisions.[1] Docket No. 25. Lavalle contends the Hotel failed to provide a reasonable accommodation, and that after she lodged a discrimination complaint and attended an administrative proceeding to explore that complaint, the Hotel fired her and cited her prior use of a false social security number as a pretext for her retaliatory termination. The Hotel successfully moved to dismiss some of the claims, leaving only the ADA discrimination and retaliation claims, the Law 44 claim, the Law 80 claim, and the Article 1802 claim.[2] Docket No. 24. The Hotel now moves for summary judgment on the remaining claims, Docket Nos. 54, 66, and Lavalle opposed. Docket No. 60. The case is before me on consent of the parties. Docket No. 29.

---

[1] Law 44, P.R. Laws Ann. tit. 1, § 501; Law 80, P.R. Laws Ann. tit. 29, § 185a; Law 100, P.R. Laws Ann. tit. 29, § 146; Law 115, P.R. Laws Ann. tit. 29, § 146; and Articles 1802 and 1803, P.R. Laws Ann. tit. 31, §§ 5141, 5142.

[2] The ADA and Law 44 discrimination claims that survived the motion to dismiss arise from an alleged failure to permit Lavalle to work as a bartender during the daytime shift. Docket No. 24.

For the reasons set forth below, the motion is **GRANTED IN PART**.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if it "is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions" of the record materials "which it believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The court does not act as trier of fact when reviewing the parties' submissions and so cannot "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon" conflicting evidence. *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Rather, it must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. But the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and may not rest upon "conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

## BACKGROUND

Except where otherwise noted, the following facts are drawn from the parties' Local Rule 56[3] submissions.[4]

International Hospitality Associates, S. en C. (SE), operated Hotel La Concha in San Juan, Puerto Rico, until 2014. SUMF ¶ 1.[5] In September 2009, Lavalle applied to be a part-time bartender in the Hotel's Lobby Bar ("Lobby Bar"). SUMF ¶ 2. At that time, she completed an employment application in which she attested to the veracity of the information contained therein and provided a false social security number. SUMF ¶¶ 3–4; Docket No. 59-1 at 1. To establish her work eligibility, she completed an I-9 form, and submitted a forged social security card and certification of no prior criminal record that relied on the false social security number. SUMF ¶ 5. She also submitted a Florida identification card, the authenticity of which is not disputed. Lavalle was hired, received an employee handbook, and began working as a part-time bartender. SUMF ¶ 7. The employee handbook prohibits providing false information or documentation to the Hotel, and provides for termination of an employee who does so. SUMF ¶ 6. In October 2010,

---

[3] Local Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." *CMI Capital Market Inv. v. Gonzalez-Toro*, 520 F.3d 58, 62 (1st Cir. 2008). It requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by citations to the record, that the movant contends are uncontested and material. D.P.R. Civ. R. 56(b), (e). The opposing party must admit, deny, or qualify those facts, with record support, paragraph by paragraph. *Id.* 56(c), (e). The opposing party may also present, in a separate section, additional facts, set forth in separate numbered paragraphs. *Id.* 56(c). While the "district court may forgive a party's violation of a local rule," litigants ignore the Local Rule "at their peril." *Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007).

[4] The Hotel's Statement of Uncontested Facts ("SUMF"), Docket No. 52-1; Lavalle's Opposing Statement of Uncontested Facts ("OSUF"), Docket No. 60-20; Lavalle's Counter Statement of Uncontested Facts ("CSUF"), Docket No. 60-1; and the Hotel's Reply to the OSUF ("ROSUF"), Docket No. 66, and to the CSUF ("RCSUF"), Docket No. 67. While Lavalle's OSUF and CSUF did not strictly comply with the Local Rule because they lacked precise record citations, I was able to find in the record the statements detailed herein that were derived from OSUF and CSUF. The record citations for these statements are included in this opinion.

[5] While International Hospitality Associates, S. en C. (SE) acknowledges that it no longer operates the Hotel, it has denied that International Hospitality Associates, Inc. is its "successor." Docket Nos. 25 at ¶ 7, 26 at ¶ 7.

Lavalle became a lawful permanent resident (a fact unknown to the Hotel at the time), and voluntarily resigned in December of that year. SUMF ¶ 7; Docket No. 60-15.

In November 2011, Lavalle re-applied to work as part-time bartender in the Lobby Bar, this time using a different social security number. SUMF ¶ 8. To establish her work eligibility, she completed an I-9 form, and submitted a lawful-permanent-resident card, social security card, and certification of no prior criminal record. SUMF ¶ 9. The authenticity of these documents is not disputed. *See* SUMF ¶ 64. The Hotel re-hired Lavalle in December 2011. SUMF ¶ 8. That same month, Marianne Medero, the Hotel's payroll manager, received Lavalle's employment application and discovered an incongruity between the social security number she used during her first term of employment and the one she recently provided. SUMF ¶¶ 11–12; Docket No. 52-4 at ¶¶ 6, 7. She relayed the incongruity to Eduardo Ortiz Lopez ("Ortiz"), an external human resources consultant whom the Hotel contacted on a "regular basis" to "provid[e] recommendations" on employment matters. Docket No. 52-5 at ¶¶ 1–3. Ortiz advised the payroll manager to "continue business as usual until he investigated further." SUMF ¶ 13.

After making "additional inquiries" into the incongruent social security numbers in December 2011, Ortiz "determined" that "unless [Lavalle] was lawfully issued two distinct social security cards . . . [she] had provided false information" to the Hotel and "most likely . . . was using" false documents. SUMF ¶ 16; Docket No. 52-5 at ¶ 5. Ortiz's declaration does not specify the nature of the "additional inquiries" he made. *See* Docket No. 52-5 at ¶ 5. Before providing a recommendation on the matter, Ortiz contacted the U.S. Department of Homeland Security ("Homeland Security") to obtain guidance. SUMF ¶ 17. Ortiz was referred to Agent Ricardo Morales ("Agent Morales"), who told Ortiz that he would check Homeland Security's records and allegedly asked him to put

off any internal employment decision on the matter until he provided guidance.[6] SUMF ¶ 18. Having received no response by January 2012, Ortiz again requested Agent Morales's guidance and the latter responded that he would provide information after reviewing Lavalle's file. SUMF ¶¶ 19–20. Ortiz did not hear back from Agent Morales and "placed [the] investigation on hold" until the latter provided a response. SUMF ¶¶ 20–21; Docket No. 52-5 ¶ 10. This being the case, Lavalle continued working in the Lobby Bar. SUMF ¶ 22.

The Lobby Bar opens at 10:00 a.m., generally closes sometime after midnight, and is busiest during nights and weekends. SUMF ¶ 23. The Lobby Bar is staffed by one daytime bartender and three to five nighttime bartenders. SUMF ¶¶ 23–24. The single daytime shift starts when the bar opens and runs until approximately 5:30 p.m. SUMF ¶ 23. From Monday through Friday, this shift was occupied by full-time employee Jonathan Ruiz ("Ruiz"); Ruiz's days off were covered by other full- or part-time bartenders. SUMF ¶ 26. The various nighttime shifts are staggered throughout the night, fluctuate throughout the week, and are rotated among the various nighttime bartenders. SUMF ¶¶ 23–25. Lavalle worked as one of the nighttime bartenders three to four times per week. SUMF ¶ 31. While the Hotel claims bartenders are responsible for preparing and serving beverages, cleaning the bar area, and charging customers, SUMF ¶ 25, Lavalle claims that bartenders did not clean the bar area. Docket No. 60-2 ¶ 14.

In October 2012, Lavalle informed the Hotel's food and beverage director, Mike Rivera ("Rivera"), that she could no longer work the nighttime bartender shift because she was taking medication that required her to sleep at night. SUMF ¶ 27. She also provided documents from her doctor, William Noguera ("Noguera"), who diagnosed Lavalle with cerebral dysrhythmia. SUMF ¶ 27. The Hotel now disputes the authenticity

---

[6] Because Ortiz's declaration refers to statements that were made by Agent Morales, these statements are arguably hearsay. However, the OSMF admits that these statements are true. OSMF ¶¶ 17, 18.

of those documents.[7] At the time, however, Rivera interpreted Lavalle's request as one for a reasonable accommodation, and so discussed the various ways the Hotel could accommodate her. SUMF ¶¶ 27, 29–30. When queried about the single day shift position at the Lobby Bar, Rivera told Lavalle that he could not offer that shift because Ruiz occupied it. SUMF ¶ 30. And because Rivera could not identify any other daytime bartender vacancies, he offered Lavalle a waiter position at Voga, a restaurant in the Hotel that serves breakfast and lunch. SUMF ¶ 28. Lavalle accepted the position, and so the Hotel scheduled Nicolas Lambides to work the nighttime bartender position she vacated. SUMF ¶ 35. Lavalle claims that at some point after she requested an accommodation, another employee, Melissa Fiallos, was hired to occupy a daytime bartender position in the Hotel's pool bar, and that she was never offered that position. OSMF ¶ 30; Docket No. 60-2 at ¶¶ 13, 18. She does not specify, however, the date or approximate time period when that position became vacant. *See* Docket No. 60-2 at ¶¶ 13, 18.

As a waiter at Voga, Lavalle worked during the daytime and was responsible for making beverages, serving food and drinks, and charging customers for their meals. SUMF ¶¶ 36–37. Lavalle remained in this position from November 2012 to March 2013, worked about as many hours as she had in the Lobby Bar, and earned approximately $27,000 in 2012 and $25,000 in 2013. SUMF ¶¶ 36, 73. While working at Voga, Lavalle complained about various issues: that she was receiving less tips than she previously had, that the shift started too early, and that the environment there was stressful and disorganized. SUMF ¶¶ 38–39.

---

[7] In response to the Hotel's objection, Lavalle has not made any effort to authenticate or otherwise lay a proper evidentiary foundation for the medical records. Docket No. 71-1, 71-2; *see Setterlund v. Potter*, 597 F. Supp. 2d 167, 171 (D. Mass. 2008) (where plaintiff did not attempt to authenticate any of the medical records she produced, court held that "the appearance of authenticity is not enough") (citing *Transurface Carriers, Inc. v. Ford Motor Co.*, 738 F.2d 42, 46 (1st Cir. 1984)).

Lavalle told Mike Rivera, and later the Hotel's general manager Luis Rivera (the "General Manager"), that she disliked working at Voga because of the tips, and asked to be transferred. SUMF ¶ 41. All positions were filled at that time, and so the General Manager told Lavalle that she could work additional shifts at Solera, the food and beverage station near the pool area, until a daytime bartender position was available. SUMF ¶ 42. Around March 2013, Lavalle began working shifts at Solera. SUMF ¶ 45. In July 2013, Lavalle felt dizzy and nearly fainted while working at Solera. Docket No. 60-2 at ¶ 21.

Three days later, Rivera received an e-mail from Lavalle's doctor, Noguera, who requested that Lavalle not work in conditions that would subject her to extreme heat and stress to the brain. SUMF ¶ 48. Rivera asked for additional guidance from Noguera, and the latter recommended that Lavalle not be exposed to prolonged hours of sunlight. SUMF ¶ 49. Following this communication, Rivera noted that the station at Solera is next to a large cooking grill that generates heat to the surrounding areas, and so he offered to transfer Lavalle to the Hotel's in-room dining (i.e., room service) department. SUMF ¶ 50. She accepted the transfer, and her last day working at Solera was July 13, 2013. SUMF ¶ 50. Lavalle began working in that department, and became a fulltime employee sometime thereafter. SUMF ¶¶ 50, 63.

On July 8, 2013, Lavalle lodged a disability-discrimination complaint with the Puerto Rico Anti-Discrimination Unit ("ADU"). Docket No. 71-3. She complained that others had been recruited and hired to the position she had requested. Docket No. 71-3 at 2. On July 16, 2013, the Hotel was notified of the ADU complaint, referred it to Ortiz, and charged him with "coordinat[ing] the process." SUMF ¶ 52; Docket No. 52-5 at ¶ 11. He contacted and hired the Hotel's outside counsel, Pablo Alvarez Sepulveda ("Alvarez"), to assist him in representing the Hotel. SUMF ¶ 53. An ADU hearing was scheduled for October 3, 2013, to explore Lavelle's disability-discrimination complaint, and both the Hotel and Lavalle were asked to attend. SUMF ¶ 54. In preparing for the

hearing, Ortiz planned to discuss the accommodations the Hotel could offer, and decided that he would take the opportunity to "make headway with the social security investigation and specifically intended to ask [Lavalle] about the conflicting social security information." Docket No. 52-5 ¶ 13.

On the date of the scheduled ADU hearing, Ortiz attended the hearing on the Hotel's behalf, and was accompanied by Alvarez. SUMF ¶ 54. Lavalle also attended, accompanied by her counsel. SUMF ¶ 54. Before the hearing began, the ADU hearing officer suggested that the parties conduct an initial conciliatory meeting. Docket No. 52-5 at ¶ 14. Per the hearing officer's instructions, Lavalle's counsel met with Alvarez. Docket No. 52-5 at ¶ 14. The two attorneys discussed the discrimination complaint, as well as possible accommodations, and Alvarez then produced the documentation Lavalle had provided at the inception of her first and second terms of employment, including the incongruent social security numbers. Docket No. 52-8 at ¶¶ 5–6.

Lavalle was asked to enter the meeting, at which point she was confronted with the incongruent social security numbers and asked to explain the incongruity. Docket No. 52-8 at ¶ 6. Lavalle claims she was surprised by the inquiries, and so told Alvarez that she "did not know why there were two social security numbers" because she "did not even remember that that had occurred." Docket No. 60-2 at ¶¶ 26, 34. Lavalle's declaration also states that Alvarez made a statement to the effect that she "had two social security numbers," *id.* ¶ 26, and that she "should dismiss [her] claim because of [her] immigration fraud."[8] *Id.* ¶ 34. Lavalle walked out, and the conciliatory meeting ultimately ended without any accord. Docket No. 52-8 at ¶¶ 5–6. Alvarez informed Ortiz of the incidents, including that he had presented Lavalle with the incongruent social security numbers, and Ortiz considered Lavalle's conduct an "inexcusable" failure to cooperate with the Hotel's

---

[8] The Hotel denied that Alvarez made this statement, argues it may not be considered, and contends that it is immaterial even if it was made. *See* Docket No. 67 at ¶¶ 13, 21. As is further explained below, this statement may be considered and is one of the genuine disputes of fact precluding summary judgment on the retaliation claim.

request that she clarify information by providing a reasonable explanation. Docket Nos. 52-5 at ¶¶ 15–16, 52-8 at ¶¶ 5–6.

On October 17, 2013, the General Manager told Lavalle that if she returned to being a part-time employee, he could offer her the day shift at the Lobby Bar on weekends. SUMF ¶ 63. Lavalle declined the offer, remained working as a full-time employee in the in-room-dining department, and did not receive any additional inquiries about the incongruent social security numbers. SUMF ¶ 63; Docket No. 60-2 at ¶ 35. Sometime between October 3 and October 25, the General Manager met with Ortiz and was "put . . . up to date on the social security investigation that [Ortiz] had briefed [him on] a while back." Docket No. 52-7 ¶ 6. It is unclear for how long, and the extent to which, the General Manager knew about this investigation. *See* Docket No. 52-7 ¶ 6. After explaining that Agent Morales had "still not contacted" him, Ortiz next told the General Manager that Lavalle had been confronted with the incongruent social security numbers at the ADU meeting and that she refused to explain the incongruity. Docket No. 52-7 ¶ 6. The General Manager told Ortiz "that [they] could not leave this matter up in the air and unresolved" and suggested that Ortiz contact a "different government source [he] knew." Docket No. 52-7 ¶ 6

Following the General Manager's suggestion, Ortiz and Alvarez visited one of Homeland Security's offices on October 25, 2013. SUMF ¶ 64; Docket No. 52-8 ¶ 7. There they met with Agent Ortiz, and discussed Lavalle's incongruent social security numbers. SUMF ¶ 64; Docket No. 52-5 ¶ 20. At that meeting, Ortiz learned that Lavalle provided a false social security number during her first term of employment with the Hotel. SUMF ¶ 64; Docket No. 52-5 ¶ 20. In November 2013, Ortiz relayed this information to the General Manager, who was "disturbed" by Lavalle's dishonesty and failure to cooperate. Docket No. 52-5 ¶ 20, 52-7 at ¶ 10.

The General Manager decided to terminate Lavalle because she had provided false information to the Hotel during her first term of employment (a violation of several

rules in the employee handbook) and the insubordinate behavior she displayed when she refused to respond to the inquiry at the ADU meeting. Docket No. 52-7 ¶¶ 10, 12. He also reviewed her personnel file to get a "clear picture." Docket No. 52-7 ¶ 11. When he did so, he noted Lavalle's disciplinary history while working at the Hotel: on March 6, 2012, she was suspended for improperly charging drinks; on January 13, 2013, for showing a lack of interest at work and for using her cellphone at work; on February 24, 2013, for arriving late and missing a staff meeting; and on March 18, 2013, for not entering the Hotel through the employee entrance. SUMF ¶ 68. On November 14, 2013, the General Manager terminated Lavalle. SUMF ¶ 71.

Lavalle filed suit, and the parties learned the information that follows during discovery. The Hotel learned that Lavalle was a "developer" at one of the restaurants she listed in her 2011 employment application, and so suggests that Lavalle lied about being a "supervisor" at that restaurant. SUMF ¶ 77. Lavalle disputes this, claiming that a "developer" at that restaurant is the equivalent of a supervisor at other restaurants. Docket Nos. 60-2 at ¶ 39, 60-8. The Hotel also learned that Lavalle did not earn a Bachelor of Science in Business Administration from Florida International University. SUMF ¶ 77. Lavalle claims that she took classes toward obtaining that degree, but acknowledges that she neither obtained that degree nor attended that institution. Docket No. 52-3 at 62. She also claims that she received the forged social security card from an unscrupulous company that told her she had applied to adjust her immigration status, and provided a payment receipt in an attempt to corroborate that claim. Docket Nos. 60-2 ¶ 31, 60-11 at 3. Lavalle acknowledged during her deposition, however, that she was aware the company had not filed any immigration documents on her behalf before arriving to Puerto Rico in 2009. Docket No. 52-3 at 79–81.

Seeking to determine whether the Hotel's claimed reasons for firing Lavalle were pretextual (i.e., whether the Hotel takes seriously violations of its employee manual that occur when an employee whose immigration status is questionable provides false

documentation), Lavalle first obtained an admission from the Hotel that it does not participate in the Federal E-Verify program. Docket Nos. 60-16, 67 at ¶ 40. Lavalle's counsel also inspected the Hotel's I-9 forms, and contends that the Hotel's proffered reasons are pretextual because other employees who have not been terminated have discrepancies in the documentation they provided to establish their work eligibility. Docket No. 60 at 3. Lavalle highlights, for example, the portion of J.J.H.'s I-9 form that is to be completed by the employer, which provides that this individual established his work eligibility with a U.S. Passport. Docket No. 62-1. The I-9 form provides the serial number that is supposed to correspond to that passport. Docket No. 62-1 at 1. A copy of the passport in the Hotel's records, which matches the serial number in the I-9 form, was issued not by the United States but by the Dominican Republic. Docket No. 62-2. The Hotel claims this discrepancy and others are "at most trivial issues" that do not show "false information" or "any irregularity." Docket No. 66 at 10.

## DISCUSSION

Lavalle contends the Hotel failed to provide a reasonable accommodation when it did not offer a daytime bartender shift, and that there is a genuine dispute of material fact as to whether the Hotel retaliated against her for engaging in protected activities.

## I.        Reasonable Accommodation

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Under the statute, discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such entity." *Id.* § 12112(b)(5)(A).

To assert a claim under the ADA for a failure to provide a reasonable accommodation, a plaintiff must establish that: (1) she suffered from a "disability" within the meaning of the statute; (2) she was a qualified individual in that she was able to perform the essential functions of her job, either with or without a reasonable accommodation; and (3) despite her employer's knowledge of her disability, the employer did not offer a reasonable accommodation for the disability. *Calero-Cerezo*, 355 F.3d at 19–20. The plaintiff bears the burden of showing a reasonable accommodation, and the defendant bears the burden of showing an undue hardship. *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001). To prove a "reasonable accommodation," a plaintiff needs to show that the proposed accommodation would enable her to perform the essential functions of her job and that "at least on the face of things, it is feasible for the employer under the circumstances." *Id.* If the "plaintiff succeeds in carrying this burden, the defendant then has the opportunity to show that the proposed accommodation is not as feasible as it appears but rather that there are further costs to be considered . . . ." *Id.*

The Hotel's motion "assum[es] for argument's sake that [Lavalle] was a disabled and qualified within the meaning of the ADA," and argues only that Lavalle cannot demonstrate that the Hotel failed to reasonably accommodate her disability. Docket No. 54 at 4. Lavalle contends that the Hotel failed to offer her an available daytime bartender position within the Hotel. Under the ADA, a reasonable accommodation "may include 'reassignment to a vacant position.'" *Phelps v. Optima Health, Inc.*, 251 F.3d 21, 27 (1st Cir. 2001) (quoting 42 U.S.C. § 12111(9)(B)). The employee "bears the burden of proof in showing that such a vacant position exists." *Phelps*, 251 F.3d at 27 (citing *Feliciano v. Rhode Island*, 160 F.3d 780, 786–87 (1st Cir. 1998)). An employer is not required to remove another employee to create a vacancy for a disabled employee. *See, e.g.*, *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 678 (7th Cir. 1998) ("an employer has no duty to 'bump' an incumbent from a position just to accommodate the request of a disabled

employee"); *see also* H.R. Rep. No. 101-485, pt. 2, at 63 ("The Committee also wishes to make clear that reassignment need only be to a vacant position—'bumping' another employee out of a position to create a vacancy is not required."); S. Rep. No. 101-116, at 32 (same).

The "employer's duty to identify vacant positions arises when the employee requests reassignment and ends after the employer determines that no positions are available or will become available in the fairly immediate future." *Albert v. Smith's Food & Drug Centers, Inc.*, 356 F.3d 1242, 1252 (10th Cir. 2004). "A position is vacant when a similarly situated, non-disabled employee would be able to apply for it." *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 745 (10th Cir. 2013) (citing *Duvall v. Georgia–Pacific Consumer Prods., L.P.*, 607 F.3d 1255, 1263 (10th Cir. 2010)).

A couple examples illustrate the importance of the timeframe in which the employee requests a reassignment to a vacant position. In *Hedrick v. Western Reserve Care System*, 355 F.3d 444, 458 (6th Cir. 2004), the court held that the employer did not violate the ADA where the record reflected that the positions the employee sought "did not become available until well after" another position was offered to the employee, and the employee "presented no evidence to establish that [the employer] knew that these positions would soon become available when it" made the offer. Similarly, in *Hoskins v. Oakland County Sheriff's Department*, 227 F.3d 719, 729 (6th Cir. 2000), the court held that the employer was not required to offer a "new position [that] was created well over a year after [the employer] became aware of [the employee's] disability."

In this case, Lavalle has failed to demonstrate that a comparable vacant position was available but not offered. As an initial matter, Lavalle's opposition fails to address with specificity the Hotel's argument that a vacant daytime bartender position with a comparable number of hours was unavailable when she asked to be re-assigned to such a position. *See Muniz-Cabrero v. Ruiz*, 23 F.3d 607, 609 (1st Cir. 1994) ("A party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual,

why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal."). Instead, she conclusorily argues—without providing evidentiary support—that the Hotel "had the ability to accommodate her from the day she made the request." Docket No. 60 at 8. And her opposing statement of material facts does not dispute the portions of Rivera's declaration which state that there were no available vacancies for a daytime bartender shift when Lavalle was offered the other positions within the Hotel. *See* OSMF ¶¶ 28, 29.

Moreover, even after interpreting the record in a light favorable to Lavalle, she has failed to meet her burden for two reasons. It is undisputed that Ruiz, as a full-time employee, held the day shift position at the Lobby Bar on weekdays. While the complaint alleges that Lavalle "sought to return to her position as a full-time bartender," Docket No. 25 ¶ 20, presumably at the Lobby Bar, the record evidence reveals that Lavalle was only a part-time bartender at that bar. To the extent Lavalle contends the Hotel was required to remove Ruiz or carve-up the shift he held to accommodate her, the contention lacks merit. *See, e.g.*, *Dalton*, Inc., 141 F.3d at 678.

The other reason is that Lavalle has failed to provide specific facts in her affidavit or elsewhere about the positions she claims became vacant and were filled by other employees. *See Lang v. Wal-Mart Stores E., L.P.*, 813 F.3d 447, 456 (1st Cir. 2016) (summary judgment proper where employee claimed in affidavit that other employees were transferred to vacant positions where "affidavit did not mention the specific circumstances of the transfers"). Thus, while Lavalle alleges in her complaint that the Hotel "hired two other bartenders to work the day shift," Docket No. 25 ¶ 2, she fails to provide evidentiary support of the timeframe in which these positions became vacant. For example, she does not specify the approximate date or time period when the Hotel hired Melissa Fiallos to occupy a daytime bartender position in the Hotel's pool bar. Having failed to do so, a reasonable jury could not determine whether the position became "available until well after" she accepted the other positions at Voga, Solera, and the in-

Lavalle Cervantes v. International Hospitality Associates, S en C (SE), et al., Civil No. 14-1356 (BJM)        15

room-dining department, or whether the Hotel "knew that these positions would soon become available when it" made those offers to Lavalle. *See Hedrick*, 355 F.3d at 458. Thus, summary judgment is granted on Lavalle's ADA disability-discrimination claim.

## II.    Retaliation

An ADA retaliation claim does not depend on the success of a disability discrimination claim, and so the dismissal of the latter claim does not preclude the retaliation claim from going forward. *See Wright v. CompUSA, Inc.*, 352 F.3d 472, 477 (1st Cir. 2003). In the absence of direct evidence of retaliation, an ADA retaliation claim "is analyzed under the familiar burden-shifting framework drawn from cases arising under Title VII." *Kelley v. Corr. Med. Servs., Inc.*, 707 F.3d 108, 115 (1st Cir. 2013). This framework requires a plaintiff to show that: "(1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." *Calero–Cerezo*, 355 F.3d at 25. This showing made, the employer next "must articulate a legitimate, non-retaliatory reason for its employment decision." *Id.* at 26. If the employer does so, the employee must then show that the proffered legitimate reason is pretextual and that "the job action was the result of the defendant's retaliatory animus." *Kelley*, 707 F.3d at 115 (quoting *Calero–Cerezo*, 355 F.3d at 26). While the employer bears a burden of production when articulating a legitimate, nonretaliatory reason for its actions, the burden of persuasion remains at all times with the employee. *Reyes-Orta v. P.R. Highway & Transp. Auth.*, 811 F.3d 67, 73 (1st Cir. 2016).

The Hotel acknowledges that Lavalle engaged in protected activity, though it implicitly argues that she engaged in protected conduct on only one occasion. The Hotel also does not dispute that Lavalle suffered a materially adverse action when she was terminated. *See Valle-Arce v. P.R. Ports Auth.*, 651 F.3d 190, 198–99 (1st Cir. 2011) ("termination of employment obviously is an adverse employment action" that "well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination") (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). As for causation, the Hotel contends that the time gap between the filing of the ADU complaint and Lavalle's termination dispels any inference of retaliation, and that Lavalle was fired for violating various rules in the employee handbook.

### A.      Protected Activity

The ADA's anti-retaliation provision states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a) (emphasis added). Consistent with this provision's capacious language, requesting an accommodation from the employer, lodging a disability-discrimination charge with an appropriate administrative agency (such as the EEOC or a state counterpart), and participating in a hearing or proceeding before such an agency are all considered protected activity. *See, e.g.*, *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 106 (1st Cir. 2007) ("Requesting an accommodation is protected conduct for purposes of the ADA's retaliation provision"); *Mariani–Colón*, 511 F.3d at 223 (plaintiff "undoubtedly" engaged in protected activity when he contacted the EEOC alleging discrimination); *Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 505 (9th Cir.), *as amended*, (9th Cir. Sept. 19, 1989) (employee terminated shortly after attending EEOC fact-finding conference).

The Hotel acknowledges that Lavalle engaged in protected activity, though it focuses only on her filing of the ADU disability-discrimination charge in July 2013. Lavalle, on the other hand, emphasizes that in October 2013 she attended the ADU proceeding. Interpreted in the non-movant's favor, as is required on summary judgment, Lavalle engaged in protected activity on at least three occasions: in October 2012, when she requested that the Hotel accommodate her disability by allowing her to work as a bartender during the day shift, *see Freadman*, 484 F.3d at 106; next, in July 2013, when

she lodged a disability-discrimination complaint with the ADU, *see Mariani–Colón*, 511 F.3d at 223; and finally, in October 2013, when she attended the ADU hearing, which aimed to explore her disability-discrimination charge and became a conciliatory conference per the hearing officer's instructions. *See Miller* 885 F.2d at 505. Thus, there is ample evidence to establish that Lavalle engaged in protected activity, and that she did so on more than one occasion.

### B.    Causation

Lavalle contends she was terminated as a result of filing the ADU complaint and attending the ADU proceeding. The Hotel, on the other hand, maintains that Lavalle breached various rules in the employee handbook when she provided a false social security number on her 2009 employment application and insubordinately refused to clarify that she had done so at the ADU proceeding. To establish a prima facie case of causality, "the plaintiff must show a nexus between the protected conduct and the alleged retaliatory act." *Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17, 37 (1st Cir. 2011). "One way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action." *Wyatt v. City of Bos.*, 35 F.3d 13, 16 (1st Cir. 1994). Courts also consider the sequence of events, any departures from normal procedure, and contemporaneous statements by the employer's decision makers. *See, e.g.*, *Del Pilar Salgado v. Abbot Labs.*, 520 F. Supp. 2d 279, 292 (D.P.R. 2007).

While the "employee's burden to establish a prima facie case in the retaliation context is not an onerous one," *Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851, 858 (1st Cir. 2008), "retaliation" must "be the but-for cause of an adverse employment action" for the employee to obtain a remedy. *Palmquist v. Shinseki*, 689 F.3d 66, 74 (1st Cir. 2012) (retaliation claim under Rehabilitation Act "borrows the causation standard from the" ADA, specifically, 42 U.S.C. § 12203(a)) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–77 (2009)); *see also, e.g.*, *Lewis v. Humboldt Acquis. Corp.*, 681 F.3d 312, 317–

22 (6th Cir. 2012) (en banc) (but-for causation, and not Title VII's mixed-motives standard, is required to establish liability under the ADA).

Lavalle first contends that her termination was very close in time to activity protected by the ADA. *See Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 110 (1st Cir. 1988) ("a showing of discharge soon after the employee engages in" protected activity "is indirect proof of a causal connection"). As the Supreme Court has noted, "cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Calero-Cerezo*, 355 F.3d at 25 (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)). "Three and four month periods have been held insufficient to establish a causal connection based on temporal proximity." *Calero-Cerezo*, 355 F.3d at 25–26 (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997); *Hughes v. Derwinski*, 967 F.2d 1168, 1174–75 (7th Cir. 1992)). On the other hand, a time period of two months or less has been held sufficient to sustain the plaintiff's burden. *See Mariani-Colon*, 511 F.3d at 224 ("'temporal proximity' between appellant's allegations of discrimination in June 2002 and his termination in August 2002 is sufficient to meet the relatively light burden of establishing a prima facie case of retaliation").

The Hotel homes in on the ADU discrimination complaint, and contends that the approximate four-month time period between that complaint and Lavalle's termination dispels any inference of retaliatory animus. *See Calero-Cerezo*, 355 F.3d at 25–26. Disagreeing with this timeframe, Lavalle highlights her attendance and participation in the October 3, 2013 ADU proceeding to show that there is approximately one month separating that protected activity and her November 14, 2013 termination. Faced with a similar time-framing issue, the D.C. Circuit has held that "an adverse action following closely on the heels of protected activity may in appropriate cases support an inference of retaliation *even when occurring years after the initial filing of charges*." *Jones v.*

*Bernanke*, 557 F.3d 670, 680 (D.C. Cir. 2009) (emphasis added); *Singletary v. District of Columbia*, 351 F.3d 519, 524–25 (D.C. Cir. 2003) (Garland, J.).

*Singletary*, for example, held that the district court erroneously evaluated temporal proximity only on the basis of the "original protected activity"—the filing of a discrimination complaint—rather than protected activity that occurred years after that initial complaint. 351 F.3d at 524–25 ("letters from [employee's] attorney [regarding discrimination charge] constituted protected conduct"); *see also Miller*, 885 F.2d at 505 (reasonable jury could infer causal connection where employee filed EEOC charge and was terminated "59 days after she attended the EEOC fact-finding conference"); *Sidaris v. Runyon*, 967 F. Supp. 1260, 1270 (M.D. Ala. 1997) ("the proximity in time between the EEOC hearing and the Plaintiff's termination is sufficient to establish a causal link between the protected activity and her termination"). *Jones* explains the reasoning underlying these cases: the anti-retaliation statutes "protect employees who engage in any protected activity," and so it is improper to consider only the "original protected activity" because doing so would mean that "temporal proximity could support an inference of retaliation only in the immediate aftermath of the employee's first protected act." 557 F.3d at 680.

In this case, Lavalle engaged in at least three protected activities: she requested an accommodation in October 2012, filed a disability discrimination charge with the ADU in July 2013, and participated in the ADU proceeding in October 2013. As in *Singletary*, it would be improper to determine whether a causal connection exists by considering the 13-month time period between Lavalle's request for an accommodation in October 2012 (the first protected activity) and her termination in November 2013. It follows from this reasoning that it would be similarly improper to consider the four-month time period between the ADU discrimination charge in July 2013 (the second protected activity) and her termination in November 2013. As in *Miller*, Lavalle's participation in the October 2013 ADU proceeding (the third protected activity) provides the starting point for the

timeframe buttressing the temporal-proximity calculus. 885 F.2d at 505; *see also Sidaris*, 967 F. Supp. at 1270. So viewed, 42 days transpired between activity protected by the ADA and Lavalle's termination. This relatively short timeframe would allow a reasonable jury to infer a retaliatory animus. *See Mariani-Colon*, 511 F.3d at 224 (timeframe of two months sufficient).

Lavalle also underscores the sequence of events leading up to her termination to suggest that she would not have been fired in the absence of the ADU complaint and hearing. *Contreras v. Corinthian Vigor Insurance Brokerage, Inc.*, 103 F. Supp. 2d 1180 (N.D. Cal. 2000) (*Contreras*), aptly illustrates how the sequence of events leading up to a retaliatory adverse action could aid a reasonable jury in inferring but-for causation. In that case, Contreras began working for Corinthian in 1995, provided a false social security number, and voluntarily resigned in March 1997. *Id.* at 1182, 1185–87. After resigning, Contreras filed a complaint with the California Labor Commissioner, alleging unpaid wages and overtime pay. *Id.* at 1185.

The complaint prompted a prehearing conference before the California Labor Commissioner in June 1997 and a full-blown hearing in October 1997. *Id.* A few days after the prehearing conference, Corinthian claimed it became concerned with Contreras's undocumented status and contacted the now-defunct Immigration and Naturalization Services ("INS"), *id.*, an agency that "merged into the Department of Homeland Security . . . in March 2003." *Wood v. Mukasey*, 516 F.3d 564, 566 (7th Cir. 2008). The INS detained Contreras soon after the prehearing conference. *Contreras*, 103 F. Supp. 2d at 1185–86. A few days before the October hearing, Corinthian also reported Contreras's use of a false social security to the Social Security Administration ("SSA"). *Id.*

Using the but-for standard of causation, the *Contreras* court held that a reasonable jury could infer a causal connection between the employee's protected activities (filing the complaint and participating in the proceedings before the California Labor Commissioner) and the materially adverse action (reporting Contreras's undocumented

status and false social security number). *Id.* at 1185–87 (citing *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 895–96 (1984) (corporation committed unfair labor practice by reporting undocumented alien employees to the INS in retaliation for participating in union activities)). Relying on the fact that Contreras had voluntarily resigned in March 1997 and the close timing between Corinthian's report to the INS and the June 1997 prehearing conference, the court reasoned that a reasonable jury could infer the requisite causal connection. *Id. Contreras* also reasoned that "there appear[ed] to be no other reason for [Corinthian] to have contacted the SSA apart from the fast approaching hearing." 103 F. Supp. 2d at 1186–87.

This case presents a similar, though not identical, sequence of events leading up to the materially adverse action. As an initial matter, a fair reading of the undisputed facts does not support Lavalle's suggestion that the Hotel knew of the incongruent social security numbers, sat on its hands with that information for two years, and then chose to re-explore the matter only after Lavalle complained to the ADU. *See* Docket No. 60 at 10. Instead, the record indicates that the Hotel contacted Homeland Security in December 2011. Yet, the undisputed facts, when read in Lavalle's favor, reveal the following trajectory: Lavalle used a false social security during her first term of employment with the Hotel, which ran from 2009 to 2010. She was re-hired at the end of 2011, and the Hotel was aware that she had used incongruent social security numbers by December of that year. Before contacting Homeland Security that same month, Ortiz conducted "additional inquiries" and determined that unless both social security cards were valid, Lavalle "had provided false information" to the Hotel and "most likely . . . was using" falsified documents to obtain employment.

And while an agent with Homeland Security said he would look into Lavalle's file, the Hotel received its last communication from that agent in January 2012. The Hotel ultimately did not receive a response from that agent and continued to employ Lavalle. Now fast-forward approximately 21 months: in October 2013, the Hotel confronted

Lavalle with the incongruent social security numbers—for the first time—at the ADU proceeding. Notably, nobody from the Hotel had asked Lavalle about the matter despite the fact that Ortiz had briefed the General Manager about the issue "a while back." Only after Ortiz relayed to the General Manager what occurred at the ADU proceeding did the General Manager decide that the matter could not be left "up in the air and unresolved." Having decided so, the General Manager suggested that Ortiz re-contact Homeland Security. After Ortiz learned from Homeland Security that Lavalle had used a false social security number during her first term of employment and relayed this information to the General Manager, Lavalle was terminated for breaching various rules of the employee handbook.

As in *Contreras*, a reasonable jury could infer a causal connection between Lavalle's termination and her ADU complaint and participation in the ADU proceeding. A reasonable jury could so find because Ortiz arguably had strong suspicions by December 2011 that Lavalle had provided false information to the Hotel, and had briefed the General Manager on the matter sometime thereafter. In light of the 21-month period that the Hotel placed the "investigation on hold," a reasonable jury could infer that Lavalle's protected activities were the catalyst for re-exploring that issue in October and November 2013. Put another way, a reasonable jury could find that in the absence of Lavalle's protected activities, she would have continued working—as she had done so for the previous 21 months—without the Hotel re-exploring or caring about the incongruent social security numbers.

In further support of a causal connection, Lavalle highlights conduct and statements by the Hotel's decision makers and "those in a position to influence" those persons. *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55 (1st Cir. 2000); *see also Kelley*, 707 F.3d at 117 ("remarks related to protected characteristic 'are appropriately taken into account . . . even where the comment is not in the direct context

of the termination'") (quoting *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 578 (5th Cir. 2003) (citation omitted) (internal quotation marks omitted)).

*Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091–92 (10th Cir. 2007), suitably illustrates how such statements may point to a causal link. In that case, the Tenth Circuit considered statements made by the employer's attorney, John Phillips, at a hearing before the New Mexico Department of Labor ("NMDOL"). *Id.* at 1084. The employee claimed that after she filed a discrimination complaint, W.D. Sports (her employer) inflicted a retaliatory adverse action by obstructing her access to unemployment benefits. *Id.* at 1091–92. To show a causal link, the employee alleged that at the hearing before the state agency, Phillips told her, "If you will drop your Human Rights claim, I won't fight you on your unemployment." *Id.* at 1092. The *Williams* court held that "a reasonable jury could quite reasonably infer from this a direct causal link between W.D. Sports's decision to impede Ms. Williams's benefits application and her decision to pursue discrimination charges with the NMDOL Human Rights Division." *Id.*

Lavalle similarly contends that the conduct and statements of Ortiz and Alvarez at the ADU proceeding intimates a causal connection between her protected activities and the reason underlying her termination. She highlights two facts, the latter of which is disputed: (1) that the incongruent social security numbers were first brought to Lavalle's attention at the ADU proceeding; and (2) Alvarez's alleged statement that she should dismiss her disability discrimination complaint "because of [her] immigration fraud."

As an initial matter, the incongruent social security matter had no relevance whatsoever to the disability-discrimination claim or to finding a reasonable accommodation for Lavalle. *See Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1074 (9th Cir. 2004) (discovery of immigration status denied because employer "had the opportunity to examine [that status] upon hiring and that [status was] irrelevant to the question of liability"). A reasonable jury could thus consider Ortiz's suspicions (formed around December 2011) that Lavalle had provided false documentation to the Hotel, his

suspicion that she was "most likely" using a false social security number, and his plan to present that information at the ADU hearing to arrive at the reasonable inference that the matter was being raised for the first time in that setting to imply that the Hotel could use the information to inflict some adverse action—as was ultimately done in *Contreras*. 103 F. Supp. 2d at 1185; *see also Rivera*, 364 F.3d at 1065 (court noted that in certain cases, "inquir[y] into workers' immigration status . . . allow[s] [employers] to raise implicitly the threat of deportation and criminal prosecution every time a worker, documented or undocumented, reports illegal practices"). Moreover, as in *Williams*, where the employer's attorney linked the discrimination charge and the adverse action, a reasonable jury could similarly link the reason underlying Lavalle's termination with protected activities upon considering Alvarez's alleged statement (i.e., that Lavalle should dismiss the disability discrimination complaint "because of [her] immigration fraud").[9]

And to the extent the Hotel contends it cannot be held accountable for the conduct and statements of these two individuals, the contention lacks merit because (1) Ortiz was charged with representing the Hotel at the ADU hearing, (2) Ortiz had Alvarez represent the Hotel at the ADU conciliatory meeting, and (3) the Hotel acknowledges that the General Manager "made the decision to terminate [Lavalle] based on the information provided by Ortiz." Docket No. 66 at 10; *see Ahmed v. Johnson*, 752 F.3d 490, 497 (1st Cir. 2014) (in meeting "modest burden" of establishing prima facie case, it was "unnecessary to distinguish . . . between the recommending employees and the ultimate decisionmaker" where the affidavits of those employees could reasonably be "be read to say that they" influenced the ultimate decision); *see also Williams*, 497 F.3d at 1091–92.

---

[9] I note that in light of recently enacted legislation, in some jurisdictions "[i]t is cause for suspension, disbarment, or other discipline for any member of the State Bar to report suspected immigration status or threaten to report suspected immigration status of a witness or party to a civil or administrative action or his or her family member to a federal, state, or local agency because the witness or party exercises or has exercised a right related to his or her employment, broadly interpreted." Cal. Bus. & Prof. Code § 6103.7.

In sum, a reasonable jury could find that Lavalle would not have been fired in the absence of engaging in protected activities.

### C.     Legitimate, Nonretaliatory Reason & Pretext

The Hotel contends the General Manager "discharged [Lavalle] because she provided false information and documentation [on] her 2009 employment application, hiring and verification for eligibility, kept [the fact that she did so] hidden and failed to cooperate [at the ADU meeting] to conceal her dishonesty." Docket No. 54 at 15 ¶ 2. The General Manager considered Lavalle's disciplinary history around the time of her termination to "get a clear picture," but the Hotel clarifies that the General Manager terminated Lavalle for the "very specific grounds" detailed above and does not suggest that it is "using after-acquired . . . evidence to justify her termination."[10] Docket No. 66 at 10. The proffered reasons warranted Lavalle's termination, the Hotel argues, because this conduct breached various rules of the employee handbook.

Providing false information to an employer during the application process is surely a legitimate, nonretaliatory reason for terminating an employee. *See, e.g.*, *EEOC v. Switching Sys. Div. of Rockwell Int'l Corp.*, 783 F. Supp. 369, 374 (N.D. Ill. 1992) (in case where employee used false social security number, court held that "if it is lawful to refuse to hire aliens in the first instance, then it also must be lawful to terminate the employment of individuals who falsified their citizenship status on their employment applications"); *League of United Latin Am. Citizens v. Pasadena Indep. Sch. Dist.*, 662 F. Supp. 443, 449 (S.D. Tex. 1987) (court ordered reinstatement of immigrants who had provided false social security numbers, but noted that "it is undoubtedly true that most employers have a policy of terminating employees who falsify their applications" and

---

[10] Neither does the Hotel's motion explain how, if at all, the after-acquired evidence limits Lavalle's remedies in this case. *See, e.g.*, *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 761 (9th Cir. 1996) ("An employer can avoid backpay and other remedies by coming forward with after-acquired evidence of an employee's misconduct . . . .").

"[u]nder ordinary circumstances, such a policy is justifiable and valid"). And so is the "firing of an insubordinate employee." *See Kelley*, 707 F.3d at 118.

Having produced legitimate, nonretaliatory reasons for Lavalle's termination, Lavalle "must proffer specific facts that would enable a reasonable factfinder to conclude that the [Hotel's] reason for [her] termination was a 'sham' intended to cover up the [its] true motive." *Ponte v. Steelcase Inc.*, 741 F.3d 310, 323 (1st Cir. 2014). To demonstrate pretext "in a way sufficient to leap the summary judgment or directed verdict hurdles," the employee may rely on various sources of circumstantial evidence, which "include, but are not limited to," (1) "evidence of differential treatment in the workplace," (2) "temporal proximity of an employee's protected activity to an employer's adverse action," and (3) "comments by the employer which intimate a retaliatory mindset." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 828 (1st Cir. 1991). Another "way to establish pretext is to show that the employer gave 'different and arguably inconsistent explanations' for their actions." *Collazo-Rosado v. Univ. of P.R.*, 765 F.3d 86, 93 (1st Cir. 2014) (quoting *Domínguez–Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000)). "[W]eaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's "proffer can do the trick . . . unless the record conclusively reveals that the real motive was an unstated reason that is nonretaliatory." *Collazo-Rosado*, 765 F.3d at 93 (internal citations omitted). Yet, "there is no mechanical formula" for establishing pretext, as it is "the type of inquiry where everything depends on the individual facts." *Kelley*, 707 F.3d at 116 (citations omitted).

Once the employee has come forward with evidence suggesting that the employer's proffered reasons are a pretext for retaliation, the court must "scrap[ ] the burden-shifting framework in favor of considering the evidence as a whole." *Mesnick*, 950 F.2d at 827. At this point, "the critical inquiry becomes whether the aggregate evidence of pretext and retaliatory animus suffices to make out a jury question." *Id.* The court must tread carefully when making this determination, as the First Circuit has

repeatedly warned that "courts must be particularly cautious about granting the employer's motion for summary judgment" where a plaintiff makes out a prima facie case and "the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination." *Kelley*, 707 F.3d at 116 (internal quotations omitted) (citing *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir. 1998)).

*Kelley* illustrates the type of showing that is sufficient to preclude summary judgment at the pretext stage. 707 F.3d at 116. In that case, the employee was fired and filed a retaliation claim under the ADA, alleging that her supervisor recommended her termination after the employee was involved in an argument with the supervisor that concerned the employee's refusal to perform certain functions of the job due to a physical injury. *Id.* at 114, 116–18. The employer argued that it had a legitimate, nonretaliatory reason for the termination because the employee's insubordinate behavior was a "serious disciplinary offense" under the personnel manual for employees. *Id.* at 114. The district granted summary judgment for the employer after considering the employer's proffered reason and reasoning that the employee's "evidence of retaliatory animus was too conclusory and speculative to take to trial." *Id.* at 115.

The First Circuit reversed, holding that a reasonable jury could find that the employee's termination was "'a disingenuous overreaction to justify dismissal of an annoying employee who asserted [her] rights under the ADA,' rather than the firing of an insubordinate employee." *Id.* at 118 (quoting *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 200 (7th Cir. 2011)). A reasonable jury could so find, the *Kelley* court reasoned, because the supervisor made various hostile comments, the comments were linked to the employee's protected activity, and the employee's termination could reasonably be viewed as the culmination of a history of disability-based conflict. *Id.* at 116–17.

In this case, there "is substantial overlap between" Lavalle's evidence of pretext and retaliatory animus. *Kelley*, 707 F.3d at 116 (citing *Santiago–Ramos*, 217 F.3d at 54 (employee "may use the same evidence to support both conclusions")). To find that the

Hotel's proffered reason is pretextual, a reasonable jury could consider the 42-day time period between the ADU proceeding and Lavalle's termination, the sequence of events leading up to the termination, and the statements and actions of the Hotel's decision makers and those in a position to influence those persons.

The sequence of events in this case warrants further discussion at the pretext stage. In *Contreras*, Corinthian advanced several explanations during the course of the litigation that were directed to establishing a legitimate, nonretaliatory reason for taking action adverse to Contreras: it claimed that it was "merely verifying and clarifying information regarding Contreras's social security number," that it was "required to report Contreras's undocumented status" to the INS, and that it was "just curious." 103 F. Supp. 2d at 1186. *Id.* The *Contreras* court was skeptical, and ultimately held that a reasonable jury could find that the proffered reasons were pretextual. *Id.*

In so holding, the *Contreras* court first noted that the employee had voluntarily resigned before Corinthian reported Contreras to the government agencies, and that Corinthian admitted it had reason to believe that Contreras was using a false social security number since January 1997—two months before Contreras resigned, five months before it reported her to the INS, and nine months before it reported her to the SSA. *See id.* This sequence prompted that court to reason: "If they were truly curious, wanted to verify the information, or were reporting Contreras out of concern for the legal requirements relating to the hiring of undocumented workers, they surely would have done so earlier, while Contreras was still in their employ and before she filed her wage claims." *Id.*

As in *Contreras*, a reasonable jury could find that the Hotel's proffered reasons are pretextual. A reasonable jury could so find because by December 2011 Ortiz arguably harbored strong suspicions that Lavalle had used false information in her employment application, did not act on that information for well over a year after January 2012, and acted on that information only after Lavalle engaged in protected activities. *See id.* And

while the General Manager told Ortiz that they could not "leave the [incongruent social security] matter up in the air," this sudden change of heart is "arguably" inconsistent and incoherent in light of the fact that the General Manager had been informed of the social security investigation "a while back." *See Collazo-Rosado*, 765 F.3d at 93 (internal citations omitted). Moreover, a reasonable jury could also consider that at the time Lavalle was fired, there was no contention that she was using a false social security number, or that her immigration status was in question at that point. *See Sure-Tan, Inc.*, 467 U.S. at 895–96 (noting that "private persons such as [employers] have no judicially cognizable interest in procuring enforcement of the immigration laws by the INS").

Also worthy of further examination is Ortiz's and Alvarez's conduct at the ADU proceeding. In *Williams*, the court held that a reasonable jury could find pretext after considering, among other things, the statement made by the employer's attorney (i.e., that the employer would not fight the employee on her unemployment benefits if she agreed to drop the complaint). 497 F.3d at 1093. The court reasoned that this statement led "to a ready inference" that the employer inflicted the adverse action "because she filed a discrimination claim and sought to oppose her benefits in the hope of dissuading her from pursuing a discrimination claim." *Id.* As in *Williams*, a reasonable jury could readily infer that the Hotel (through Ortiz and Alvarez) was attempting to dissuade Lavalle from pursuing a discrimination complaint by presenting her with the incongruent social security numbers at the ADU proceeding. A jury might be particularly inclined to make this finding if it credits the statement Lavalle alleges Alvarez made (i.e., that Lavalle had used two different social security numbers and that she should dismiss the ADU discrimination claim "because of [her] immigration fraud").

Lavalle also presses that there is circumstantial evidence of "differential treatment in the workplace." *Mesnick*, 950 F.2d at 828. In essence, her theory is that—with a wink and a nod—the Hotel hires immigrants who provide false or subpar documentation to establish their work eligibility and then pulls the welcome mat out from under them when

they complain. *Rivera* sums up the gist of the theory she presses here: "[r]egrettably, many employers turn a blind eye to immigration status during the hiring process; their aim is to assemble a workforce that is both cheap to employ and that minimizes their risk of being reported for violations of statutory rights. Therefore, employers have a perverse incentive to ignore immigration laws at the time of hiring but insist upon their enforcement when their employees complain." 364 F.3d at 1072.

To support her theory, Lavalle first highlights that the Hotel has readily admitted that it does not use the Federal E-Verify program to verify the information provided on the I-9 forms. Docket No. 60-16. Lavalle then points to the I-9 form and supporting documentation of one of the Hotel's employees, J.J.H. She presses that the employer's portion of the I-9 form states that this individual established his eligibility to work in the United States with a U.S. Passport. Docket No. 62-1 at 1. Yet, the supporting documentation is a passport from the Dominican Republic that contains the same serial number written on the employer's portion of the I-9 form. Docket No. 62-1 at 1–2. Faced with this discrepancy, the Hotel responds that this "individual provided a passport for identity and for work authorization an alien number." Docket No. 67 ¶ 41.

The Hotel's rebuttal misses the mark and fails to clear the discrepancy for at least three reasons. First, because the employer's portion of the I-9 form claims that a U.S. Passport was provided as proof of work eligibility, it is simply untrue that the sole purpose of providing the passport was to establish the employee's identity. Second, because the alien authorization card was not provided, there is nothing in the record to suggest that the Hotel corroborated the alien authorization number with appropriate documentation. The third reason is that the Hotel's explanation is incoherent in light of the fact that, as a general matter, an alien authorized to work in the United States is ineligible for a U.S. Passport. *See* 22 U.S.C. § 212; 22 C.F.R. § 51.2(a) (U.S. Passports may only be issued to United States nationals). Lavalle requested that the Hotel admit that this employee and others did not file discrimination complaints and were not

disciplined for the information provided in their I-9 forms, and the Hotel did so. Docket No. 67 at 26 ¶ 45. This being the case, there is some—but to be sure, not much— evidence to support Lavalle's theory.[11] A reasonable jury very well might consider this evidence, along with the other evidence detailed above, to find that the Hotel's reasons for terminating Lavalle were disingenuous.

To be sure, there are two narratives to be told based on the conflicting evidence in the record. On one hand is the Hotel's version: that in December 2011 it discovered Lavalle had used incongruent social security numbers; that it began an investigation shortly thereafter and contacted Homeland Security to obtain guidance; that after the investigation was placed on hold, it was resumed coincidentally with the time period in which Lavalle engaged in protected activities; and that in November 2013, the Hotel terminated Lavalle because its investigation culminated in the discovery of serious violations of various rules in the employee handbook.

The other story to be told is that by December 2011 the Hotel harbored strong suspicions that Lavalle had used a false social security number, that it perhaps cared about the issue initially but later swept it under the rug when Homeland Security did not provide the requested guidance, that it conveniently went on a retaliatory fishing expedition after Lavalle engaged in protected activities, and that it used the fruit of that investigation as a pretext for firing Lavalle. Which of these two divergent accounts is grounded in fact presents a triable issue that rests squarely within the prerogative of a jury. *See Anderson*, 477 U.S. at 255. Thus, summary judgment is denied on Lavalle's ADA retaliation claim.

## III.    State-Law Claims

The Hotel has moved to dismiss the Law 44, Law 80, and Article 1802 claims. *See* Law 44, P.R. Laws Ann. tit. 1, § 501; Law 80, P.R. Laws Ann. tit 29, § 185a; Article

---

[11] While Lavalle also points to other I-9 forms, the connection between those forms and her theory is more attenuated. Docket No. 62-2–62-4.

1802, P.R. Laws Ann. tit. 31, § 5141. Law 44 is "Puerto Rico's counterpart to the ADA," and "creates an obligation for any employer to provide reasonable accommodations." *Salgado-Candelario v. Ericsson Caribbean, Inc.*, 614 F. Supp. 2d 151, 175 (D.P.R. 2008); *see also Gonzalez v. El Dia, Inc*., 304 F.3d 63, 74 n.8 (1st Cir. 2002) ("Law 44 claim . . . is coterminous with [an] ADA claim") (citing *Acevedo Lopez v. Police Dep't of P.R.*, 247 F.3d 26, 29 (1st Cir. 2001)). Because "the elements of proof for a claim under Law 44 are essentially the same as those for establishing a claim under the ADA," *Salgado–Candelario*, 614 F. Supp. 2d at 175, and because summary judgment is appropriate as to Lavalle's ADA failure-to-accommodate claim, the Hotel is entitled to summary judgment on the Law 44 claim. *See Gonzalez*, 304 F.3d at 74 n.8.

Law 80 "requires employers to compensate employees who are discharged without just cause." *Baltodano v. Merck, Sharp & Dohme (I.A.) Corp.*, 637 F.3d 38, 41–42 (1st Cir. 2011). "Discriminatory animus and retaliation do not constitute just cause . . . ." *Aguirre v. Mayaguez Resort & Casino, Inc.*, 59 F. Supp. 3d 340, 357 (D.P.R. 2014) (citing P.R. Laws Ann. tit. 29, § 185b); *see also Garcia v. Am. Airlines, Inc.*, 673 F. Supp. 63, 66 (D.P.R. 1987) ("the Legislative Assembly of Puerto Rico amended Law 80 . . . to include an anti-retaliation provision" and so "an employee's participation in administrative, legislative, and judicial proceedings against his employer can no longer constitute just cause for dismissal").

The burden-shifting framework under Law 80 places on the employee the initial burden of alleging unjustified dismissal and proving actual dismissal. *Baltodano*, 637 F.3d at 42. Once the employee does so, the burden of persuasion shifts and the employer must prove that the discharge was justified. *Id.* The burden then shifts back to the employee to show a lack of just cause. *Id.* In this case, it is undisputed that the Hotel terminated Lavalle in November 2013. The Hotel then claims it terminated Lavalle for "just cause," again citing Lavalle's breach of various rules in the employee handbook when she provided a false social security number on her 2009 employment application

and later failed to clarify that she did so. Yet, because Law 80 contains an anti-retaliation provision, and there is a genuine dispute of material fact as to whether the Hotel retaliated against Lavalle for engaging in protected activities, summary judgment on this claim is denied. *See Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 53 n.10 (1st Cir. 2010) ("In light of . . . conclusion [in Title VII retaliation claim] that there [was] a genuine issue of fact as to whether [employee's] termination was the result of retaliatory animus, rather than company reorganization and inadequate performance, [court] . . . reverse[d] the grant of summary judgment on [the employee's] Act 80 claim").

An "Article 1802 claim is not cognizable" where it "arises from the same facts as plaintiff's claims under the ADA." *Aguirre*, 59 F. Supp. 3d at 357. This is so because "the tort provision of the Civil Code is supplementary to special legislation." *Id.* Indeed, as the Puerto Rico Supreme Court recently explained, "Article 1802 constitutes a general source of law" that can serve as a vehicle for "emotional distress damages . . . as long as there is no applicable special law—such as a labor law—that may prohibit or limit such a claim." *Pagan-Renta v. Walgreens of San Patricio, Inc.*, 190 D.P.R. 251 (P.R. 2014). Because Lavalle attempts to shoehorn into the Article 1802 claim the same facts which form the basis of her ADA claim and does not identify distinct tortious conduct, the claim is not cognizable in this case. *See* Docket No. 25 at 7–8. Thus, Lavalle's Article 1802 claim is dismissed.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment is **GRANTED IN PART**. The ADA and Law 44 claims alleging a failure to provide a reasonable accommodation, as well as the Article 1802 claim, are **DISMISSED WITH PREJUDICE**. The ADA retaliation claim and the Law 80 claim remain.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 31st day of May 2016.

S/Bruce J. McGiverin
BRUCE J. McGIVERIN
United States Magistrate Judge